IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD ANTONIO HUNDLEY,<br><br>    Petitioner,<br><br>  vs.<br><br>W.L. MONTGOMERY, Acting Warden,<br>Calipatria State Prison,[1]<br><br>    Respondent. | No. 2:12-cv-3051-JKS<br><br>MEMORANDUM DECISION |

    Richard Antonio Hundley, a state prisoner proceeding *pro se*, filed a Petition for a Writ

of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Hundley is currently in the

custody of the California Department of Corrections and Rehabilitation and is incarcerated at

Calipatria State Prison.  Respondent has answered, and Hundley has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

    The California Court of Appeal set forth the factual and procedural background of

this case as follows:

### I
### The Prosecution

    [David] Barreda, the victim, met Desiree Santillan at a car show in 2008, and the
two began communicating over the internet.  Eventually, they arranged to meet at
Desiree's home on the evening of November 24, 2008.  Desiree, who was 18 years old at
the time, lived with her stepmother Heather Santillan, Heather's boyfriend [Curtis Level]
Chapman,[3] Heather's three young sons, Tammy Turney, and Turney's son Hundley.
    Barreda arrived at Desiree's home late in the afternoon.  He and Desiree sat at the
dining room table talking, while Chapman and Hundley played video games in the living

---

[1]  W.L. Montgomery, Acting Warden, Calipatria State Prison, is substituted for G.J.
Janda, former Warden, Calipatria State Prison.  Fed. R. Civ. P. 25(d).

room, and Heather remained in her room.  Eventually, Barreda began talking to Chapman and Hundley.  Barreda "bragged" about his cars, motorcycles, guns, and access to drugs.  He said that "he had a lot of different kinds of guns if anybody was looking to buy some" and pulled a gun out of his pants and showed it to Chapman and Hundley.  Desiree told Barreda she was uncomfortable with him having a gun in the house.  Barreda gave the gun to her, and she placed it in the trunk of Heather's car.  Desiree later returned the gun to Barreda.

At some point, Turney, who had heard Barreda talking, decided to "rob" him.  She took Barreda's keys and directed Hundley to go through Barreda's car and steal anything of value.  Hundley did so but did not find anything except two CDs.  Hundley returned the keys to Turney, and Turney put them in her pocket and went to bed.

Later, when Barreda attempted to leave, he could not find his keys.  He telephoned a few locksmiths, but none came.  Eventually, Desiree said he could sleep on the couch, which he did.

Sometime after Hundley searched Barreda's car, Chapman told Hundley, Barreda's "gotta go, I'm gonna smack him."  "Smack" is slang for "kill."  Hundley responded, "Don't kill him, just rob him regular, put your gun to his head and take his property."

The following morning Desiree helped her younger brothers get ready for school, and at approximately 8:00 a.m., she and Heather left to walk them to school.  Meanwhile, Chapman, Hundley and Barreda spoke in the kitchen.  Chapman, who was armed with a gun, told Barreda it was "disrespectful" for him to have a gun in the house and demanded Barreda give him his gun, which he had in his lap.  Chapman and Hundley told Barreda "we're going to take your shit."  A dispute followed, and Chapman shot Barreda in the back of the head.

Chapman and Hundley dragged Barreda's body from the kitchen to the garage, placed it in the trunk of Barreda's car, and drove Barreda's car to a nearby location.

Heather and Desiree returned to the house at approximately 8:30 a .m. and saw that Barreda's car was gone.  As they walked inside, Heather smelled smoke and saw a broken lamp in the kitchen and Desiree's purse thrown in front of the refrigerator.  Desiree attempted to call and text Barreda but got no response.  Turney was the only one home, and she was acting "pretty hyper."  She told Heather that she needed to talk to her outside.  Once outside, Turney told Heather Barreda was dead, and they had his gun.  While they were talking, Chapman and Hundley walked up to the house.  Chapman had blood on his t-shirt, and Hundley had blood by his knee and on his shoe.  When Heather noticed "smudges" of blood in the garage, she attempted to clean them with bleach.

The next day, November 26, 2008, Barreda's body was discovered inside the trunk of his car.  He died from a single gunshot to the back of his head.  He was shot with either a .38 special or .357 magnum caliber bullet.

Detectives with the Sacramento County Sheriff's Department began investigating Barreda's death.  They obtained Barreda's cell phone records and began cold calling recently dialed phone numbers.  On December 1, 2008, a detective dialed a number, and Desiree answered.  She indicated she knew Barreda and that she lived at an address that was approximately one mile from where Barreda's body was found.  She agreed to meet

with the detective at his office the following day, December 2, 2008.  Based on information gleaned during that interview, detectives contacted Heather for an interview.  Heather was interviewed later that day and into the next.

When interviewed by law enforcement, Chapman initially denied knowing why the detective wanted to speak to him.  Later, he admitted helping dispose of Barreda's body but maintained that Hundley killed Barreda "[t]o rob him of his belongings."  Finally, when asked directly whether he was "the shooter," Chapman nodded his head in the affirmative.  Thereafter, he told detectives that he wrapped Barreda's gun in a red towel and disposed of it in a nearby backyard.  A detective searched the area described by Chapman but was unable to locate the gun.  He did find a red towel and a Carl's Jr. bag containing a box of Remington .38 special ammunition.

At trial, both Desiree and Heather testified under grants of immunity.  Desiree admitted that before she was interviewed on December 2, 2008, Heather told her to say that they were cousins, and that nobody was living at Heather's house except Desiree, Heather, and Heather's sons.  She also conceded that Turney told her not to mention Turney to the detective.  Desiree initially complied with Heather and Turney's instructions and lied about what happened.  Later, she decided to stop lying and told the truth about what happened in the hours before Barreda's murder.

Heather admitted prior felony convictions for welfare fraud and passing bad checks.  As to the instant case, she admitted pleading guilty to illegally purchasing ammunition and to being an accessory after the fact.  She acknowledged that as a result of her deal with the prosecution to testify truthfully in this matter and at Turney's trial, she was sentenced to one year in jail for those crimes and a probation violation.  She also conceded that while this case was pending, she was arrested for petty theft and falsely stated she was in protective custody at that time.

Heather also explained that she initially lied to law enforcement to protect herself, her children, and everyone involved.  She described how Turney had threatened to kill her and her children if she mentioned Turney or Hundley to detectives and how she feared Turney because Turney had told her she "had been involved in violence before" that "involved individuals being seriously hurt or killed."  When first interviewed by law enforcement on December 2 and 3, 2008, she never stated that Chapman admitted shooting Barreda.  She stated that Chapman told her "they did it" and that his family's gun was used to shoot Barreda.  Heather conveyed so much fear to the detectives about what might happen to her or her children as a result of what she said during the interview that she and her children were placed into protective custody.  In February 2009, she was attacked and told she "better not tell on [Turney] and [Hundley]" and "better put the blame on [Chapman]."

Heather was interviewed a second time on December 10, 2008.  During that interview, she stated that Chapman admitted shooting Barreda.  She acknowledged that between her first and second interview, she learned that the mother of Chapman's child had been visiting him in jail.  She also acknowledged that this made her angry because she did not know Chapman was still seeing the woman.

Both Heather and her 11 year-old son Anthony testified that Chapman told them he was the shooter.  Anthony initially testified that Chapman told him he accidentally

shot [Barreda].  More particularly, Chapman told Anthony "[t]hat [Turney] and [Hundley] were planning to jack [Barreda] . . . [a]nd that the guy was just sitting there, but then the guy knew that something was happening.  [¶]  And then he pulled out his gun, and [Chapman] was just coming out of the room, and he got squared, then he shot him because he was frightened he might be shot."  Later, Anthony testified that Chapman told him that Hundley "was distracting [Barreda], and [Chapman] swung over and shot him in the head."  When Chapman's counsel observed during cross-examination that Anthony's testimony "about [Hundley] distracting and [Chapman] shooting . . . [was] different than what you said that [Chapman] told you before about what happened," Anthony stated that his subsequent testimony was "real."  He explained that "[t]he other one I thought, but now everything is coming clear."  Anthony was surreptitiously videotaped at the sheriff's station telling Heather that Chapman "said [Hundley] was distracting [Barreda], and [Chapman] swang [sic] over and shot the guy in the head."

Heather also testified that Hundley himself told her that he was "[t]alking with [Barreda], almost like distracting him" when Chapman shot Barreda.

## II
## The Defense

Chapman did not testify at trial.

Hundley testified in his own defense as follows:  He was outside having a cigarette when Barreda arrived.  Barreda went inside with Desiree, and Hundley went to his room.  He came out about 30 minutes later, and saw Turney, Chapman, Desiree, and Barreda drinking and talking.  At some point, Barreda and Desiree left to go to the store.  While they were gone, Heather told Chapman and Hundley that Desiree had hidden a gun for Barreda somewhere in the house, and Turney said "they could steal it."  The plan was for Hundley to be the "look-out" while Turney and Chapman looked for the gun.  They did not find the gun before Desiree and Barreda returned, and Desiree, Barreda, and Turney resumed drinking.  At some point, Barreda asked Desiree for his gun in front of everyone, and Desiree went to the garage, retrieved the gun, and handed it to him.  Barreda showed the gun to everyone and asked, "you guys know anybody who wants to buy guns[?]  I get guns and I sell them."  Hundley said he would like to buy a gun, but he did not have any money.  As Chapman looked at the gun, Barreda continued to "go on and on" about guns and told them he had "a 40 caliber with a laser" in his car.

Later, Turney told Hundley and Chapman that Barreda was "slipping" and suggested that she grab his keys and that Hundley or Chapman search his car for the gun with the laser.  They agreed, and when Barreda was not looking, Turney took his keys and gave them to Hundley, who searched Barreda's car.  He found a couple of compact discs, which he took, but nothing else.  He returned to the house, placed Barreda's keys on a table, and went into his room.

About 10 minutes later, Chapman entered Hundley's room and told him he was going to "smack" Barreda for his gun.  Hundley told Chapman "that's stupid" and there was "no reason" for him to kill Barreda.  He advised Chapman that "if you plan on robbing him, just . . . put [your] gun in his face and just take the gun off him."  Hundley

-4-

explained the gun was probably stolen, and thus, it was unlikely Barreda would call the police and report the robbery.  At that point, Chapman said "he was done" and "would forget about it."  Hundley thought that was the end of it; he never agreed to Chapman's plan to rob and kill Barreda or to share the gun or the profits from the sale of the gun.

The next morning, Hundley went to the kitchen to heat up some coffee, and Barreda sat down at the kitchen table and began talking to him.  As Hundley turned away from Barreda, he heard a "boom."  When he turned back around, he saw Barreda hit the floor.  Hundley asked Chapman, "what the fuck is wrong with you [?]"  Chapman ignored Hundley and went through Barreda's pockets.  Chapman took Barreda's gun from Barreda's waistband, put it on the table, and told Hundley, "it's me [sic] and yours."  When Turney entered the kitchen, Chapman began barking orders.  Hundley initially refused to assist him, but ultimately helped get rid of Barreda's body because he wanted it out of the house as soon as possible.

During cross-examination, Hundley conceded that he failed to say anything about not wanting Chapman to rob Barreda when he was interviewed by law enforcement.  Rather, he told the police that Chapman "wasn't supposed to kill him, he was just supposed to rob him. . . ."  Hundley also admitted having a prior conviction for possessing crack cocaine for sale.  ([California] Health & Saf. Code, § 11351.5.)

Following a joint trial, separate juries convicted Hundley and Chapman of the first-degree murder of Barreda, and found that the murder was committed while they were engaged in the commission of a robbery.  The trial of co-defendant Turney was severed.  Chapman's jury also found that he used a firearm to commit the murder.  Both Hundley and Chapman were sentenced to life in prison without the possibility of parole for Barreda's murder.  Chapman was additionally sentenced to a consecutive term of 25 years to life for the firearm enhancement.  Among other things, the trial court ordered both men to pay a $10,000 parole revocation restitution fine and a $30 court facilities assessment.  The court refused to award either Chapman or Hundley presentence custody credit for the time they spent in actual custody prior to being sentenced.

Through counsel, Hundley directly appealed, arguing that: 1) his conviction was not supported by substantial evidence; 2) the trial court prejudicially erred in permitting Chapman's

counsel to "delve into the facts" underlying Hundley's prior felony conviction for possession of crack cocaine with the intent to sell; 3) the court improperly admitted Chapman's out-of-court statements implicating Hundley; 4) the parole revocation fine should be stricken because it is not authorized where Hundley was sentenced to life in prison without parole; 5) the court erred in completely denying actual custody credit; and 6) the court assessment fee was unauthorized. The California Court of Appeal found that the trial court erred in imposing the $10,000 parole revocation fine because Hundley was sentenced to life without the possibility of parole, and otherwise affirmed the judgment of conviction in a reasoned opinion.

Hundley filed a counseled petition for rehearing, arguing that the court should grant a rehearing to determine whether the aiding and abetting instructions misled the jury on individual culpability.  The Court of Appeal summarily denied the petition.

Hundley filed a counseled petition for review to the California Supreme Court, arguing that: 1) the instructions on aiding and abetting were improper; 2) his conviction was not supported by substantial evidence; 3) the trial court prejudicially erred in permitting Chapman's counsel to impeach Hundley with the underlying facts of his prior felony conviction for possession of crack cocaine with the intent to sell; and 4) the trial court erred in admitting evidence of Chapman's out-of-court statements implicating Hundley.  Hundley additionally joined in claim 1 of Chapman's petition for review, in which Chapman argued that the Court of Appeal improperly refused to correct the undisputed error in calculation of actual presentence credits.  The California Supreme Court summarily denied both petitions for review.  Hundley timely filed his pro se Petition with this Court on December 11, 2012.

## II. CLAIMS RAISED

In his Petition to this Court, Hundley argues as follows: 1) the trial court improperly instructed the jury on liability as an aider and abettor; 2) the evidence was insufficient to convict him as an aider and abettor; 3) the trial court prejudicially erred in permitting Chapman's counsel to "delve into the facts" underlying Hundley's prior felony conviction for possession of crack cocaine with the intent to sell; and 4)  the trial court erred in admitting evidence of Chapman's out-of-court statements implicating Hundley.  Hundley additionally requests an evidentiary hearing.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is "contrary" to federal law "if the state court applies a rule that contradicts the governing law set forth" in controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision," *Williams*, 529 U.S. at 412, and not circuit precedent, *see Renico v.*

*Lett*, 559 U.S. 766, 778-79 (2010).  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds and not on the supervisory power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Thus, where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"  *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

In applying these standards in habeas review, this Court reviews the "last reasoned decision" by the state court.  *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).  Under AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

IV. DISCUSSION

Claim One: Instructional Error

Hundley first argues that the trial court erred in instructing the jury on aiding and abetting.  Respondent argues that this claim is unexhausted because Hundley raised it for the first time in his petition for rehearing.  According to Respondent, because Hundley raised this claim in a procedural context that did not require the Court of Appeal to consider the merits unless there was good cause to do so, he did not "fairly present" the claim to the state courts.  In his Traverse, Hundley concedes that claim 1 is unexhausted and should not be heard.  This claim is accordingly dismissed.

Claim Two: Insufficient Evidence

Hundley next argues that the evidence was insufficient to establish that he harbored the

requisite intent to be found guilty as aider and abettor.  He asserts that he withdrew from the plan

to rob and kill Barreda and attempted to dissuade Chapman from killing Barreda.  Hundley

concedes that he assisted in disposing of the body and car, but claims that at most he is guilty as

an accessory after the fact.

The Court of Appeal resolved this claim against Hundley as follows:

> Murder is the unlawful killing of a human being with malice aforethought.  ([CAL.
> PENAL CODE] § 187, subd. (a).)  Murder that is committed in the perpetration of robbery
> is first degree felony-murder.  (§ 189.)  "The purpose of the felony-murder rule is to deter
> those who commit the enumerated felonies from killing by holding them strictly
> responsible for any killing committed by a cofelon, whether intentional, negligent, or
> accidental, during the perpetration or attempted perpetration of the felony."  (*People v.
> Cavitt* (2004) 33 Cal.4th 187, 197 (*Cavitt*).)  The felony-murder rule generally acts as a
> substitute for the mental state ordinarily required for murder; *the only mental state
> required is the specific intent to commit the inherently dangerous underlying felony.*  (*Id.*
> at pp. 197, 205.)  Where, as here, the inherently dangerous underlying felony is robbery,
> the prosecution must only prove the defendant's specific intent to steal.  (*People v.
> Pollock* (2004) 32 Cal.4th 1153, 1175.)
>
> Under the felony-murder rule, for a nonkiller to be liable for the felony murder
> committed by the killer, the nonkiller must at a minimum, "have been, at the time of the
> killing, a conspirator or aider and abettor in the felony."  (*People v. Pulido* (1997) 15
> Cal.4th 713, 723.)  A person aids and abets the commission of a crime when he or she,
> with knowledge of the unlawful purpose of the perpetrator, and with the intent or purpose
> of committing, facilitating or encouraging commission of the crime, by act or advice,
> aids, promotes, encourages or instigates the commission of the crime.  (*People v.
> Prettyman* (1996) 14 Cal.4th 248, 259; *People v. Beeman* (1984) 35 Cal.3d 547, 561.)
>
> Viewed in the light most favorable to the judgment, the evidence showed that
> Hundley wanted Barreda's gun and had attempted to steal it the night before Barreda was
> shot.  When Chapman told Hundley he was going to kill Chapman for his gun, Hundley
> told him he did not need to kill him; rather, he could simply "put [his] gun to [Barreda's]
> head and take his property."  Immediately before Barreda was shot, Hundley and
> Chapman told him, "we are going to take your shit."  Hundley distracted Barreda, while
> Chapman shot him in the back of the head.  After Barreda hit the floor, Chapman
> removed Barreda's gun from his waistband and told Hundley "it's me [sic] and yours."
> On this record, a jury reasonably could conclude Hundley knew of Chapman's plan to
> rob Barreda and facilitated, encouraged, and participated in the commission of the

robbery.  As previously discussed, that is all that is required under the felony-murder rule.  (See *People v. Pollock, supra,* 32 Cal.4th at p. 1175; *People v. Pulido, supra,* 15 Cal.4th at p. 723.)

As for Hundley's assertion that he instructed Chapman *not* to kill Barreda and was "shocked" when Chapman shot Barreda, "it is no defense to felony murder that the nonkiller did not intend to kill, forbade his associates to kill, or was himself unarmed. [Citations.]"  (*Cavitt, supra,* 33 Cal.4th at p. 198, fn. 2.)  Thus, even if true, Hundley's assertions are not a defense to felony murder. (See *id.* at p. 202.)

As articulated by the Supreme Court in *Jackson*, the constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 130 S. Ct. 665, 673 (2010) (reaffirming this standard).  This Court must, therefore, determine whether the California court unreasonably applied *Jackson*.  In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial.  *Jackson*, 443 U.S. at 318-19.  Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution."  *Id*. at 326; *see McDaniel*, 130 S. Ct. at 673-74.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law.  *See Engle v. Isaac,* 456 U.S. 107, 128 (1982).  Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must undertake its inquiry by reference to the elements of the crime as set forth in state law.  *Jackson*, 443 U.S. at 324 n.16.  This Court must also be ever mindful of the deference owed to the trier of fact and the sharply limited nature of constitutional sufficiency

review. *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005).  A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey,* 546 U.S. 74, 76 (2005) (per curiam); *see West v. AT&T,* 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").  A determination of state law by a state intermediate appellate court is also binding in a federal habeas action.  *See Hicks v. Feiock,* 485 U.S. 624, 629-30 & n.3 (1988) (noting that state appellate court's determination of state law is binding and must be given deference).

In arguing that he withdrew from the plan to kill Barreda and did not actively participate in the shooting, Hundley is urging this court to re-weigh the evidence before the jury.  This Court, however, is precluded from either re-weighing the evidence or assessing the credibility of witnesses.  Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain the conviction.  *See Schlup v. Delo*, 513 U.S. 298, 330 (1995).  The Court of Appeal concluded that there was sufficient evidence to support the jury's verdict that Hundley was guilty as an aider and abettor as set forth under state law.  Although it might have been possible to draw a different inference from the evidence, this Court is required to resolve that conflict in favor of the prosecution.  *See Jackson*, 443 U.S. at 326.  Hundley bears the burden of establishing by clear and convincing evidence that these factual findings were erroneous.  28 U.S.C. § 2254(e)(1).  He has failed to carry such burden.  The record does not compel the conclusion that no rational trier of fact could have found proof that Hundley was guilty of felony-murder, given evidence of his intent to rob

Barreda, especially considering the double deference owed under *Jackson* and AEDPA.

Hundley therefore cannot prevail on this claim.

Claim Three: Improper Impeachment

Hundley next argues that Chapman's counsel improperly attempted to impeach him by

"delv[ing] into the facts underlying [his] prior felony conviction [for possession of crack cocaine

with intent to sell] after [Hundley] admitted to the conviction."  He claims that, under state law,

where a defendant admits to a prior felony conviction, a further inquiry into the facts underlying

that conviction is inappropriate.  According to Hundley, "[t]he improper impeachment questions

sought to sully [his] character by unnecessarily delving into irrelevant, inadmissible, and

unsavory facts."

Respondent argues that Hundley's argument fails because there is no Supreme Court

precedent establishing that due process compels the exclusion of details underlying a prior

conviction.  In his Traverse, Hundley agrees and claims relief is barred.  Accordingly, this claim

is dismissed.

Claim Four: Admission of Chapman's Statements Implicating Hundley

Hundley lastly argues that the trial court admitted evidence of Chapman's out-of-court

statements implicating Hundley in violation of *Bruton v. United States*, 391 U.S. 123 (1968).

The California Court of Appeal denied Hundley relief on this claim as follows:

> Hundley contends the admission of Chapman's out-of-court statements
> implicating Hundley "as a knowing participant in the shooting" violated his Sixth
> Amendment right to confront and cross-examine Chapman and the rule established in
> *Bruton v. United States* (1968) 391 U.S. 123 [20 L. Ed. 2d 476] (*Bruton*).  We disagree.
> The People moved in limine to admit evidence that shortly after Barreda's
> murder, Chapman told Anthony that "while . . . Hundley was talking to Barreda and
> distracting him, he (Chapman) leaned over and shot him."  The People also sought to
> admit evidence that Chapman told Anthony where he put Barreda's gun after the

shooting.  The People argued the statements were admissible against Hundley because they were not testimonial, "were made many days prior to police involvement," were "directly against Chapman's penal interest," and "describe[d] [Chapman's] own involvement as more serious than that of Hundley."  Hundley objected, arguing the statements were not trustworthy and ran afoul of *Bruton*.  The trial court ruled the evidence was admissible against Hundley, as well as Chapman, finding the statements were trustworthy and "clearly implicate[d] [Chapman's] penal interests."

The *Bruton* rule bars the admission of one defendant's out-of-court statement that incriminates a codefendant.  (*Bruton, supra,* 391 U.S. at pp. 135-136 [20 L. Ed. 2d at p. 485].)  The rule assumes that the statement is inadmissible hearsay against the codefendant.  (*People v. Smith* (2006) 135 Cal. App. 4th 914, 922.)  "[I]f the statement is *admissible* against the codefendant under a hearsay exception, and its admission otherwise survives confrontation analysis, then the jury may consider it against the codefendant; no reason exists for severance or redaction.  [Citation.]"  (*Ibid.*)  Such is the case here.

The statements were admissible under the declarations against interest exception to the hearsay rule, which permits admission of those portions of a declarant's statement that are "specifically disserving" to the declarant's interest.  (*People v. Leach* (1975) 15 Cal. 3d 419, 441.)  Under this particular exception to the hearsay rule, the trial court must redact any portion of a statement not specifically disserving to the declarant.  (*People v. Duarte* (2000) 24 Cal. 4th 603, 612.)

However, a statement of one defendant that implicates another is admissible provided it satisfies the statutory definition of a declaration against interest and satisfies the constitutional requirement of trustworthiness.  (*People v. Cervantes* (2004) 118 Cal. App. 4th 162, 176-177.)  "'This necessarily requires a "fact-intensive inquiry, which would require careful examination of all the circumstances surrounding the criminal activity involved; . . . " [Citation.]'"  (*Ibid.*)

In this case, the statements are sufficiently against the penal interest of Chapman to satisfy the exception.  Chapman's statement that "while . . . Hundley was talking to Barreda and distracting him, he (Chapman) leaned over and shot him" was against Chapman's penal interest because it implicated him as the shooter.  Chapman's statement as to where he hid Barreda's gun was against Chapman's penal interest because it implicated him in the robbery.

There was also evidence of trustworthiness.  "There is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception. The trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry."  (*People v. Greenberger* (1997) 58 Cal. App. 4th 298, 334-335.)  "[T]he most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures."  (*Id.* at p. 335.)

Here, Chapman's statement was made shortly after the crime, in a noncoercive environment to a trusted friend.  Chapman did not attempt to shift blame to Hundley;

rather, he ascribed the greatest criminal culpability to himself by acknowledging he was the shooter.  All of this was sufficient evidence to support the trial court's conclusion that the statements were trustworthy.

Turning to the confrontation analysis, there was no confrontation clause violation because Chapman's statements to Anthony were not testimonial.  The confrontation clause of the Sixth Amendment is concerned solely with hearsay statements that are testimonial.  (*Davis v. Washington* (2006) 547 U.S. 813, 821-825 [165 L. Ed. 2d 224, 237-239].)  "[I]t is the 'involvement of government officers in the production of testimonial evidence' that implicates confrontation clause concerns."  (*People v. Geier* (2007) 41 Cal. 4th 555, 605.)  Chapman's statements to Anthony were not formal statements to a government officer, but informal statements to a friend, thus they were not testimonial and did not violate the confrontation clause.  (*People v. Jefferson* (2008) 158 Cal. App. 4th 830, 842.)

Because Chapman's statements were not inadmissible hearsay, and were not testimonial, they were admissible under both *Bruton* and *Crawford v. Washington* (2004) 541 U.S. 36 [158 L. Ed. 2d 177].  The trial court did not err in so concluding.

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, *Pointer v. Texas*, 380 U.S. 400, 403 (1965), provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him," U.S. CONST. amend. VI.

In *Bruton*, the United States Supreme Court held that a defendant's right to confrontation is violated where a non-testifying co-defendant's confession naming the defendant as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider the confession only against the defendant.  391 U.S. at 135-36.  *Bruton's* scope was limited by *Richardson v. Marsh*, 481 U.S. 200, 208 (1987), in which the Supreme Court held that the admission of a non-testifying co-defendant's confession does not violate the Confrontation Clause where a proper limiting instruction is given and "the confession [is] not incriminating on its face [but becomes] so only when linked with evidence introduced later at trial."  *But see Gray v. Maryland*, 523 U.S. 185, 189-92 (1998).

In *Crawford v. Washington*, 541 U.S. 36, 51 (2004), the Supreme Court clarified Sixth Amendment jurisprudence and held that the Confrontation Clause guarantees a defendant's right to confront all witnesses who "bear testimony" against him.  Thus, the Supreme Court explained that the Sixth Amendment prohibits the admission of "testimonial" hearsay unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination.  *Id*. at 68. *Crawford* and its progeny have made clear that Confrontation Clause protections are limited to testimonial statements.  *See Giles v. California*, 554 U.S. 353, 376 (2008) ("[O]nly *testimonial* statements are excluded by the Confrontation Clause."); *Whorton v. Bockting*, 549 U.S. 406, 420 (2007) (Confrontation Clause has "no application" to non-testimonial statements).

Although the Ninth Circuit has not expressly held so, other circuits have concluded that *Bruton* must be viewed through the lens of *Crawford*, and that *Bruton* therefore does not apply to non-testimonial statements.  *See Peoples v. Gipson*, No. CV 10-09107, 2011 WL 5593789, at *11 (C.D. Cal. Oct. 28, 2011) (noting that "numerous other circuits have held that *Bruton* does not apply to non-testimonial statements"); *see, e.g.*, *United States v. Dargan*, 738 F.3d 643, 651 (4th Cir. 2013) ("*Bruton* is simply irrelevant in the context of nontestimonial statements.  *Bruton* espoused a prophylactic rule designed to prevent a specific type of Confrontation Clause violation.  Statements that do not implicate the Confrontation Clause, *a fortiori*, do not implicate *Bruton*."); *United States v. Berrios*, 676 F.3d 118, 128 (3d Cir. 2012) ("[B]ecause *Bruton* is no more than a by-product of the Confrontation Clause, the [Supreme] Court's holdings in *Davis* and C*rawford* likewise limit *Bruton* to testimonial statements."); *United States v. Figueroa-Cartagena*, 612 F.3d 69, 85 (1st Cir. 2010) ("It is thus necessary to view *Bruton* through the eyes of *Crawford* and *Davis*.  The threshold question in every case is whether the challenged

statement is testimonial.  If it is not, the Confrontation Clause has 'no application.'" (quoting

*Whorton*, 549 U.S. at 420)); *United States v. Smalls*, 605 F.3d 765, 768 n.2 (10th Cir. 2010)

("[T]he *Bruton* rule, like the Confrontation Clause upon which it is premised, does not apply to

nontestimonial hearsay statements."); *United States v. Dale*, 614 F.3d 942, 958 (8th Cir. 2010)

("Reading *Bruton* in light of *Crawford*, we conclude that a *Bruton* violation must be predicated

on a *testimonial* out-of-court statement implicating a co-defendant."); *United States v. Johnson*,

581 F.3d 320, 326 (6th Cir. 2009) ("Because it is premised on the Confrontation Clause, the

*Bruton* rule, like the Confrontation Clause itself, does not apply to nontestimonial statements.");

*United States v. Taylor*, 509 F.3d 839, 850 (7th Cir. 2007) (concluding that there was no *Bruton*

error because the challenged remarks were non-testimonial under *Crawford*).  Accordingly, if the

statement is not testimonial, neither *Crawford* nor *Bruton* apply.[2]

_____

[2]        The Court of Appeal's analysis that there was no *Bruton* error because the
statements fell under an exception to the hearsay rule and were trustworthy is contrary to federal
law.  Under *Ohio v. Roberts*, 448 U.S. 56, 66 (1980), the Supreme Court held that the
Confrontation Clause did not bar admission of an unavailable witness's statement if the
statement had adequate indicia of reliability.  Evidence satisfied that test if it fell within a firmly
rooted hearsay exception or had particularized guarantees of trustworthiness.  *Id.  Crawford*
rejected the *Roberts* analysis, concluding that although the ultimate goal of the Confrontation
Clause is to ensure reliability of evidence, "it is a procedural rather than a substantive
guarantee."  541 U.S. at 61.  It continued: The Confrontation Clause "commands, not that
evidence be reliable, but that reliability be assessed in a particular manner: by testing in the
crucible of cross-examination."  *Id*.  Although the reasoning in *Roberts* is thus no longer
applicable to testimonial statements, it may still be applied by the states to determine the
admissibility of non-testimonial hearsay.  *See id.* at 68 ("Where nontestimonial hearsay is at
issue, it is wholly consistent with the Framers' design to afford the States flexibility in their
development of hearsay law—as does *Roberts*, and as would an approach that exempted such
statements from Confrontation Clause scrutiny altogether.  Where testimonial evidence is at
issue, however, the Sixth Amendment demands what the common law required: unavailability
and a prior opportunity for cross-examination.").  *Id.*; *cf. Jensen v. Pliler*, 439 F.3d 1086, 1090
(9th Cir. 2006) (declining to decide whether the firmly rooted hearsay exception or particularized
guarantees of trustworthiness test enunciated in *Roberts*, 448 U.S. at 66, is still the applicable
law for non-testimonial evidence under the Confrontation Clause).  Thus, under federal law, a

Hundley argues that the Supreme Court has not yet decided if *Bruton* applies to non-testimonial hearsay, and that other jurisdictions are divided.  However, most of the cases he cites to pre-date *Crawford* and thus have no persuasive value.  *See United States v. Avery*, 760 F.2d 1219, 1223 n.7 (11th Cir. 1985), *overruled on other grounds*, *United States v. Watson*, 886 F.2d 381, 385 n.3 (11th Cir. 1989) ("*Bruton* holds that any extra judicial statement of one defendant, not otherwise admissible against his co-defendant, may not be introduced in the co-defendant's trial.").  In addition, the Third Circuit has explicitly held that it no longer follows the holdings of *United States v. Mussare*, 405 F.3d 161, 168 (3d Cir. 2005) ("We have interpreted *Bruton* expansively, holding that it applies not only to custodial confessions, but also when the statements of the non-testifying co-defendant were made to family or friends, and are otherwise inadmissible hearsay."), *Monachelli v. Warden, SCI Graterford*, 884 F.2d 749, 753 (3d Cir. 1989) (concluding that *Bruton* is applicable "where the statements of the non-testifying co-defendant were made in a non-custodial setting to family and friends"), and *United States v. Ruff*, 717 F.2d 855, 857-58 (3d Cir. 1983) (concluding that although the trial court erred in admitting statements co-defendant made to friends and relatives, the error was harmless because the evidence against the defendant was overwhelming), because "[a]ny protection provided by *Bruton* is . . . only afforded to the same extent as the Confrontation Clause, which requires that the challenged statement qualify as testimonial." *Berrios*, 676 F.3d at 128.  Hundley also cites to *United States v. Truslow*, 530 F.2d 257 (4th Cir. 1975), where the Fourth Circuit considered whether the admission of incriminating statements made between defendants after the

---

court reviewing for *Bruton* error must first determine if the statement at issue is testimonial. Although the court's analysis was contrary to federal law, its ultimate conclusion—that there was no *Bruton* or *Crawford* error—was not.

termination of their conspiracy would violate *Bruton*.  *Truslow* is inapplicable here because

Hundley was not charged with conspiracy, and the statement at issue was not made between co-

defendants, but instead was made by Chapman to an uninvolved party.  In sum, contrary to

Hundley's assertion, there is no circuit split as to whether *Bruton* applies to non-testimonial

hearsay.  Rather, post-*Crawford*, the circuits appear to have unanimously concluded that where a

statement is non-testimonial, neither *Crawford* nor *Bruton* apply, and no error can be found

under either line of cases.[3]

　　　　While the Court in *Crawford* "le[ft] for another day any effort to spell out a

comprehensive definition of 'testimonial,'" the Court provided some guidance for ascertaining

whether evidence is testimonial.  *Crawford,* 541 U.S. at 68.  First, the Court observed that "[a]n

accuser who makes a formal statement to government officers bears testimony in a sense that a

person who makes a casual remark to an acquaintance does not."  *Id.* at 51.  The Court next

offered three "formulations of [the] core class of 'testimonial' statements": 1) "*ex parte* in-court

testimony or its functional equivalent—that is, material such as affidavits, custodial

examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial

statements that declarants would reasonably expect to be used prosecutorially"; 2) "extrajudicial

statements . . . contained in formalized testimonial materials, such as affidavits, depositions,

---

[3]　　　　In any event, even if there were a circuit split, Hundley would not be entitled to
relief given the lack of Supreme Court authority on the issue.  *See Ruiz v. Scribner*, 341 F. App'x
278, 279 (9th Cir. 2009) ("Although the California Court of Appeals' [sic] holding was
ultimately erroneous, in light of the circuit split and silence of the Supreme Court, it was neither
contrary to nor an unreasonable application of the Supreme Court's holdings at that time.")
(citations omitted); *King v. Brazelton,* No. CV 13-1019, 2013 WL 6072019, at *8 (C.D. Cal.
Nov. 18, 2013) ("Such a split further confirms the absence of any clearly established federal law
that would render the California Supreme Court's adjudication objectively unreasonable.").

prior testimony, or confessions"; and 3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 51-52 (citations omitted).  The Court also gave examples of clearly testimonial statements— "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . police interrogations." *Id.* at 68.

Here, Chapman privately made the statements to Anthony, his girlfriend's 11-year-old son, who was "becoming [a] friend[]," while they were together in Anthony's home where Chapman was also staying at the time.  Chapman made the statements shortly after the crime and before the police became involved.  The statements and the circumstances they were made under are a far cry from the type of declaration that represented the focus of concern in *Crawford*. Rather, they appear more akin to the kinds of private statements to friends and family outside of a law enforcement or investigatory context which have been held to be non-testimonial in nature. *See Delgadillo v. Woodford*, 527 F.3d 919, 926-27 (9th Cir. 2008) (victim's statements to her co-workers that petitioner had abused her were non-testimonial, but similar statements to police were testimonial); *United States v. Brown*, 441 F.3d 1330, 1360 (11th Cir. 2006) ("[T]he private telephone conversation between mother and son, which occurred while [the mother] was sitting at her dining room table with only her family members present, was not testimonial."); *Ramirez v. Dretke,* 398 F.3d 691, 695 & n.3 (5th Cir. 2005) (co-defendant's out-of-court statement to person he was staying with that petitioner had hired him to kill a fireman was not testimonial since it was "made outside any arguably judicial or investigatory context"); *United States v. Hendricks*, 395 F.3d 173, 181 (3d Cir. 2005) (surreptitiously monitored private conversations and statements in wiretap records were non-testimonial because, among other reasons, "the

speakers certainly did not make the statements thinking that they would be available for later use at trial") (citation omitted); *Horton v. Allen,* 370 F.3d 75, 84 (1st Cir. 2004) (statements made in a private conversation do not qualify as testimonial).  The Court of Appeal therefore reasonably concluded that Chapman's statements to Anthony were non-testimonial, and accordingly, neither *Bruton* nor *Crawford* applied and there was no error.

In any event, any error in the admission of the statements is harmless.  *See Slovik v. Yates*, 556 F.3d 747, 755 (9th Cir. 2009) ("Confrontation Clause errors are subject to harmless-error analysis.").  Heather, Anthony's mother, testified that Champan told her he was the shooter and that she heard that Hundley distracted Barreda while Chapman shot him.  Because Anthony's testimony regarding Chapman's statements was cumulative of other evidence introduced at trial, any error in its admission did not have a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  Hundley therefore cannot prevail on this claim.

Evidentiary Hearing

Lastly, Hundley requests an evidentiary hearing.  Hundley fails, however, to specify what evidence he wishes to present.  A district court may not hold an evidentiary hearing on a claim for which a petitioner failed to develop a factual basis in state court unless the petitioner shows that: (1) the claim relies either on (a) a new rule of constitutional law that the Supreme Court has made retroactive to cases on collateral review, or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence, and (2) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that, but for

constitutional error, no reasonable fact finder would have found the petitioner guilty of the underlying offense.  28 U.S.C. § 2254(e)(2).

Where the failure to develop the factual basis for the claim in the state court proceedings is not attributable to the petitioner, to receive an evidentiary hearing, the petitioner must make a colorable claim for relief and meet one of the factors set forth in *Townsend v. Sain*, 372 U.S. 293 (1963).  *Insyxiengmay v. Morgan*, 403 F.3d 657, 670-71 (9th Cir. 2005).  In *Townsend*, the Supreme Court concluded that a federal habeas petitioner is entitled to an evidentiary hearing on his factual allegations if: (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.  *Id*. at 670 (quoting *Townsend*, 372 U.S. at 313), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992).

As discussed above, Hundley has failed to assert a colorable claim for relief as to any of his claims.  Because he does not cite to new laws or underlying facts that were not developed on the record before the state courts, he also has failed to satisfy his burden of proof under 28 U.S.C. § 2254(e)(2).  Accordingly, Hundley's request for an evidentiary hearing is denied.

## V. CONCLUSION

Hundley is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** Hundley's request for an evidentiary hearing is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: May 8, 2014.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge